IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LUCINE W. BOULANGER,

        Plaintiff,                No. CIV S-07-0849 DAD

    vs.

MICHAEL J. ASTRUE,         <u>ORDER</u>
Commissioner of Social Security,

        Defendant.

_____/

        This social security action was submitted to the court without oral argument for ruling on plaintiff's motion for summary judgment or remand and defendant's cross-motion for summary judgment. For the reasons explained below, plaintiff's motion is granted, the decision of the Commissioner of Social Security (Commissioner) is reversed, and the matter is remanded with the direction to calculate and award benefits.

## PROCEDURAL BACKGROUND

        On May 21, 2003, plaintiff filed applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act) and Supplemental Security Income (SSI) under Title XVI of the Act, alleging disability beginning July 23, 2002. (Transcript (Tr.) at 68-72, 228-32.) Plaintiff's applications were denied initially in July 2003 and upon reconsideration in November 2003. (Tr. at 47, 49-60, 233-44.) A hearing was held before Administrative Law

1

Judge (ALJ) Robert K. Rogers, Jr. on November 19, 2004. (Tr. at 61, 349-64.) Plaintiff, who

was not represented at that time, testified at the hearing, as did a vocational expert. In a decision

issued on January 15, 2005, the ALJ found plaintiff not disabled. (Tr. at 34-41.)

In February 2005, plaintiff obtained counsel, who requested review of the ALJ's

decision. (Tr. at 27-30.) On April 21, 2005, the Appeals Council granted the request, vacated

the decision, and remanded the case to the ALJ with directions to address the opinion of treating

physician Dr. Laurence Heard, evaluate plaintiff's mental impairment, offer a new hearing, and

issue a new decision. (Tr. at 246-48.) The Appeals Council specifically required the ALJ to:

(1) obtain additional evidence concerning plaintiff's physical and mental impairments; (2)

reconsider Dr. Heard's opinion after requesting that he provide additional evidence and/or clarify

his opinion; (3) evaluate plaintiff's mental impairment using the proper technique; (4) give

further consideration to plaintiff's residual functional capacity and provide support for all

assessed limitations; and (5) obtain supplemental evidence from a vocational expert to clarify the

effect of the assessed limitations on plaintiff's occupational base. (Tr. at 247.)

On remand, a hearing was held before ALJ Mark C. Ramsey[1] on November 22,

2005. (Tr. at 365-407.) Plaintiff appeared with counsel and testified. A second vocational

expert and a medical expert also testified. At a supplemental hearing held on October 17, 2006,

plaintiff and the second vocational expert testified again. (Tr. at 408-32.) On January 22, 2007,

the ALJ issued a decision finding plaintiff not disabled. (Tr. at 14-19.)

The ALJ entered the following findings in the January 22, 2007 decision:

1. The claimant met the disability insured status requirements of
the Act on July 23, 2002, the date the claimant stated she became
unable to work, and continues to meet them through September 30,
2004.

2. The claimant has not engaged in substantial gainful activity
since July 23, 2002.

---

[1] Plaintiff's case was reassigned on remand due to the fact that ALJ Rogers had taken a
position as administrative law judge with another agency. (Tr. at 368.)

3.  The medical evidence establishes that the claimant has severe left thoracic outlet syndrome,[2] but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.  The claimant's testimony that she is restricted to sitting and standing for one half hour at a time, walking one half to one block or a maximum of about five to 10 minutes of walking, are not credited because such limitations are not shown to be a reasonable consequence of her medically determinable impairment. Additionally, even assuming such limitations were a reasonable consequence of her medically determinable impairment the record viewed as a whole and particularly indications of symptom elaboration by the claimant undermine her credibility regarding her stated limitations and thus cannot be credited.

5.  The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work involving simple, unskilled work requiring that the individual not be required to work in unison with others and that she is unlimited in standing, walking, and sitting, and is limited to occasional lifting, carrying, etcetera with her dominant right[3] hand to 2 pounds and with her non-dominant right arm can handle light work involving 10 pounds frequently and 20 pounds occasionally and no overhead work with the left (20 CFR §§ 404.1545 and 416.945).

6.  The claimant is unable to perform her past relevant work.

7.  The claimant's residual functional capacity for the full range of light work is reduced by the limitations indicated above.

8.  The claimant is 44 years old, which is defined as younger individual (20 CFR §§ 404.1563 and 416.963).

9.  The claimant has greater than a high school education (20 CFR §§ 404.1564 and 416.964).

10.  The claimant does not have any acquired work skills which are transferable to the skilled or semi-skilled work functions of other work (20 CFR §§ 404.1568 and [sic]

/////

---

[2] "Thoracic outlet syndrome" is defined as "[c]ompression of the brachial plexus and subclavian artery by attached muscles in the region of the first rib and the clavicle, characterized by pain in the arm, numbness in the fingers, and weakness in the hand muscles." Stedman's Medical Dictionary 832 (1995).

[3] As reflected in the text of the ALJ's decision and in the medical records, plaintiff is left-handed. (Tr. at 15.)

1    11. Although the claimant's additional nonexertional limitations
do not allow her to perform the full range of light work, using the
2    Medical-Vocational Guidelines as a framework for
decisionmaking, there are a significant number of jobs in the
3    national economy which she could perform. Examples of such
jobs are: can filing [sic] machine operator, information clerk, and
4    office helper.

5    12. The claimant was not under a "disability," as defined in the
Social Security Act, at any time through the date of this decision
6    (20 CFR §§ 404.1520(f) and 416.920(f)).

7    (Tr. at 18-19.)

8        On April 23, 2007, the Appeals Council denied plaintiff's request for review of

9    the ALJ's January 22, 2007 decision. (Tr. at 7-11.) Plaintiff sought judicial review pursuant to

10   42 U.S.C. § 405(g) by filing the complaint in this action on May 2, 2007.

11                                    **LEGAL STANDARD**

12       The Commissioner's decision that a claimant is not disabled will be upheld if the

13   findings of fact are supported by substantial evidence in the record as a whole and the proper

14   legal standards were applied. Schneider v. Comm'r of the Soc. Sec. Admin., 223 F.3d 968, 973

15   (9th Cir. 2000); Morgan v. Comm'r of the Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

16   The findings of the Commissioner as to any fact, if supported by substantial evidence, are

17   conclusive. Miller v. Heckler, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is such

18   relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

19   Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Morgan, 169 F.3d at 599); Jones

20   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985) (citing Richardson v. Perales, 402 U.S. 389, 401

21   (1971)).

22       A reviewing court must consider the record as a whole, weighing both the

23   evidence that supports and the evidence that detracts from the ALJ's conclusion. Jones, 760 F.2d

24   at 995. The court may not affirm the ALJ's decision simply by isolating a specific quantum of

25   supporting evidence. Id.; see also Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If

26   substantial evidence supports the administrative findings, or if there is conflicting evidence

4

supporting a finding of either disability or nondisability, the finding of the ALJ is conclusive, Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987), and may be set aside only if an improper legal standard was applied in weighing the evidence, Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

In determining whether or not a claimant is disabled, the ALJ should apply the five-step sequential evaluation process established under Title 20 of the Code of Federal Regulations, Sections 404.1520 and 416.920. Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The five-step process has been summarized as follows:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Yuckert, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.; Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

**APPLICATION**

Plaintiff advances five arguments in support of her motion for summary judgment or remand: (1) the ALJ erred when he did not find that plaintiff has the medically determinable

impairment of complex regional pain syndrome, did not determine that the impairment is severe, and did not consider whether plaintiff's impairments are medically equivalent to a listed impairment; (2) the ALJ erred when he found plaintiff's testimony concerning her symptoms and limitations not fully credible and disregarded the corroborative statements of three lay witnesses; (3) the ALJ erred when he found that plaintiff has the residual functional capacity to perform a limited range of light work; (4) the ALJ erred when he failed to include pain and other limitations in the hypothetical questions he posed to the vocational expert and relied on the expert's testimony given in response to the ALJ's incomplete hypotheticals; and (5) the ALJ erred when he failed to comply with the Appeals Council's remand order regarding Dr. Heard's opinion, rejected Dr. Heard's opinion without stating specific and legitimate reasons, and disregarded evidence that supported Dr. Heard's opinion. The court addresses plaintiff's first four arguments below but finds it unnecessary to address plaintiff's fifth argument.

**I. <u>Steps Two and Three: Medically Determinable Impairments and Their Severity</u>**

At step two of the sequential evaluation process, the ALJ must determine if the claimant has any medically severe impairment or combination of impairments. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1289-90 (9th Cir. 1996) (citing <u>Yuckert</u>, 482 U.S. at 140-41). The Commissioner's regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a) & 416.921(a). Basic work activities are "the abilities and aptitudes necessary to do most jobs," and those abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, and carrying, (2) capacities for seeing, hearing, and speaking, (3) understanding, carrying out, and remembering simple instructions, (4) use of judgment, (5) responding appropriately to supervisors, co-workers, and usual work situations, and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b) & 416.921(b).

/////

The Supreme Court has recognized that the Commissioner's "severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." Yuckert, 482 U.S. at 153. However, the regulation must not be used to prematurely disqualify a claimant. Id. at 158 (O'Connor, J., concurring).

To prevent premature disqualification of claimants, the Ninth Circuit has held that "[a]n impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (quoting Smolen, 80 F.3d at 1290, and adding emphasis). "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." Social Security Ruling (SSR) 85-28, 1985 WL 56856, at *3. "Step two, then, is 'a de minimis screening device [used] to dispose of groundless claims[.]'" Webb, 433 F.3d at 687 (quoting Smolen, 80 F.3d at 1290). See also Edlund v. Massanari, 253 F.3d 1152, 1158-59 (9th Cir. 2001); Tomasek v. Astrue, No. C-06-07805 JCS, 2008 WL 361129, at *13 (N.D. Cal. Feb. 11, 2008) (describing claimant's burden at step two as "low").

In the present case, the ALJ found that "[t]he medical evidence establishes that the claimant has severe left thoracic outlet syndrome, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1." (Tr. at 18.) The ALJ noted that plaintiff had been treated for chronic discomfort involving her hands for some time before she applied for disability benefits in November 2003 and that "by the latter part of 2002 she was reportedly experiencing discomfort and swelling in her left hand of a variable nature to the point that on some days she could not use her left hand." (Tr. at 15.) The ALJ

/////

/////

7

noted further that plaintiff had been treated for tendinitis[4] and that left thoracic outlet syndrome was subsequently diagnosed and confirmed by electrodiagnostic studies. (Tr. at 15-16.) However, the ALJ did not discuss plaintiff's other physical impairments, despite the fact that the record contains evidence that complex regional pain syndrome (CRPS) was also diagnosed and treated. (Tr. at 340-46.)

The ALJ's failure to consider CRPS as an impairment may have arisen in part from his erroneous premise that "[i]n her disability application, [claimant] alleged becoming disabled on July 23, 2002, because of left thoracic outlet syndrome." (Tr. at 14.) In fact, plaintiff's disability applications reflect that she alleged disability because of "a problem with [her] left arm and hand." (Tr. at 76.) Plaintiff stated in her application that she could not lift anything because it hurt too much and that she stopped working on July 23, 2002, because she could not use her left arm or hand and was unable to continue working. (Id.) The diagnosis of CRPS, like the earlier diagnoses of tendinitis and thoracic outlet syndrome, relates to plaintiff's problem with her left arm and hand, i.e., the problem that is the basis for her claim of disability.

An ALJ is required to consider all evidence in the claimant's record when deciding whether the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(3) & 416.920(a)(3). Because the ALJ decided in this case that plaintiff was not under a disability through the date of his decision on January 22, 2007, he was required to consider all evidence of record as of that date. The evidence of record on January 22, 2007, demonstrated that plaintiff was diagnosed with and treated for CRPS as well as left thoracic outlet syndrome.

The court finds that the ALJ erred in failing, at a minimum, to acknowledge the diagnosis of CRPS and discuss it. On the basis of the medical records summarized below, the /////

---

[4] "Tendinitis" is defined as "inflammation of a tendon." Stedman's Medical Dictionary 822 (1995). "Tendonitis" is a variant of "tendinitis." Finding both spellings in the record, the court adopts the spelling used by plaintiff's treating physician.

court finds that the ALJ also erred by failing to identify CRPS as one of plaintiff's medically determinable impairments and by failing to find it to be a severe impairment.

The extensive treatment records of plaintiff's treating physician, Laurence Heard, M.D., reflect that by early January 2002 he had diagnosed tendinitis with respect to plaintiff's complaints of pain in her left hand. (Tr. at 170.) On January 30, 2002, Dr. Heard noted that plaintiff had "experienced new and relatively complete weakness in her hands, awakening during the night on several occasions" after her previous visit that month. (Tr. at 167-68.) Dr. Heard prescribed medication and planned to follow up with plaintiff's orthopedist. (Tr. at 167.) Dr. Heard continued to assess tendinitis throughout 2002 and regularly prescribed a codeine-containing analgesic. (Tr. at 165-66, 157-58, 155-56, 151-52, 148-49, 146-47.)

When Dr. Ferraro, plaintiff's orthopedist, saw her in July 2002, he noted that he had been seeing plaintiff for right wrist pain since 1999, that she had an eight-year history of dorsal left hand pain, that x-rays and bone scans had all been negative, and that plaintiff complained that it was hard to keep a job because of the pain in her left hand. (Tr. at 153.)

In March 2003, plaintiff reported to Dr. Heard that she had suffered swelling of her left elbow and went to an emergency room, where she underwent a test she described as an ultrasound exam and was informed by a surgeon that she had thoracic outlet syndrome. (Tr. at 143.) Dr. Heard performed a neurological examination, tentatively also diagnosed thoracic outlet syndrome in addition to common extensor tendinitis/left, and referred plaintiff to a specialist for consultation on the new diagnosis. (Tr. at 142-43.)

Harvinder S. Birk, M.D., a board-certified neurologist in the Neuro-Electrodiagnostic Department at Mercy Medical Center in Redding, examined plaintiff on April 24, 2003, and performed tests that included motor nerve conduction, F-wave studies, sensory nerve conduction, and needle EMG data. (Tr. at 125-27.) He found electrophysiologic evidence of left thoracic outlet syndrome. (Tr. at 127.)

/////

When plaintiff was seen by Dr. Heard on April 30, 2003, she reported that she experienced particular discomfort when attempting to place her left hand behind the small of her back or behind the back of her head, was unable to reach overhead, could not operate a stick-shift vehicle, was sleeping poorly, and had found it necessary to increase the frequency of her codeine-containing analgesic, exceeding the prescribed dosing. (Tr. at 140.) Upon examination, Dr. Heard found her unable to perform more than 70 per cent of external and 80 per cent of internal rotation at the left shoulder, with tenderness to palpation about the subcromial bursa on the same side. He had not yet received Dr. Birk's report confirming the diagnosis of thoracic outlet syndrome and therefore assessed thoracic outlet syndrome "versus shoulder impingement." He gave plaintiff a pain injection and planned to request authorization for Neurontin or refer plaintiff to Dr. Ferraro for impingement testing, depending on Dr. Birk's test results. (Id.)

By the time Dr. Heard saw plaintiff on June 4, 2003, he had received Dr. Birk's report confirming left thoracic outlet syndrome. (Tr. at 137.) As plaintiff was no longer getting adequate relief from pain by using a codeine-containing analgesic, Dr. Heard prescribed hydrocodone (Vicodin), Neurontin, and pyridoxine hydrochloride. He provided plaintiff with information about left thoracic outlet syndrome and therapeutic exercises. Cervical spine films were ordered to rule out cervical rib. (Id.) In July 2003, Dr. Heard increased the dosage of both hydrocodone and Neurontin because plaintiff was not getting adequate pain relief. His neurologic examination reflected that plaintiff was reluctant to use her left hand and that palpation precipitated dysesthesias. He noted that the cervical spine films were negative for cervical rib. (Tr. at 134.)

On August 6, 2003, plaintiff was seen by J. Nichols, M.D., another orthopedic specialist. (Tr. at 131-32.) On that date, Dr. Nichols found that she had normal range of motion without limitation in both upper extremities. (Tr. at 132.) When Dr. Heard saw plaintiff on August 11, 2003, he noted that the specialist had determined that the pain in plaintiff's upper

/////

extremities does not lend itself to surgical management. Dr. Heard continued hydrocodone and increased the dosage of Neurontin. (Tr. at 129.)

On September 22, 2003, Dr. Heard found that plaintiff had decreased grip strength and mild atrophy in her left hand. (Tr. at 225-27.) Changes were made to medication, and Dr. Heard noted that plaintiff had both Dr. Ferraro and Dr. Nichols had found that plaintiff's problem did not lend itself to surgical management. (Id.)

On November 19, 2003, Dr. Heard noted that plaintiff was still unable to perform her customary job duties. (Tr. at 222-23.) He increased the dosage of one of her medications and noted that he had completed a social services form regarding plaintiff's disabilities. (Tr. at 222.) The form completed on November 19, 2003 is the treating source opinion that the ALJ was directed to reconsider on remand. (Tr. at 246, citing Ex. 6F [tr. at 208].) The one-page form requires the medical provider to check boxes and enter minimal data; no space is provided for explanations or comments. (Tr. at 208.) By checking boxes, Dr. Heard certified that plaintiff has a medically verifiable condition that would limit or prevent her from performing certain tasks, that the onset date of her condition was 1995, that the condition is chronic, that plaintiff was actively seeking treatment, that her next appointment was in January 2004; that plaintiff was not able to work, and that plaintiff has limitations that affect her ability to work or participate in education or training. (Id.)

Dr. Heard continued to diagnose and treat plaintiff for thoracic outlet syndrome in 2004 and 2005, adjusting medication as necessary due to increasing pain and side effects caused by various medications. (Tr. at 217-18, 215-16, 210, 289, 284-85, 283, 281-82.) As noted above, during that two-year period the first ALJ held a hearing in November 2004 and issued an unfavorable decision in January 2005. The Appeals Council remanded the case in April 2005, and the second ALJ held a hearing in November 2005, leaving the record open for additional medical evidence.

/////

When Dr. Heard saw plaintiff on May 24, 2006, she reported that she had lost the use of her left arm, it took her an hour to shower because she is limited to the use of her right arm only, and she had developed discoloration on the back of her left hand adjacent to her forearm and elbow, with intermittent swelling in that area. After reviewing the history and past treatment of plaintiff's problem with her left hand and arm, Dr. Heard examined plaintiff and recorded objective findings that included her inability to cooperate for a raised arm stress test, Adson's maneuvers abnormal on the left, and grip strength of 1/5 on the left side. (Tr. at 345-46.) His assessment was that "[t]he patient has developed signs of an autonomic neuropathy and the diagnosis of complex regional pain syndrome now applies." (Tr. at 346.) Dr. Heard discussed therapeutic options with plaintiff and prescribed medications. (Id.)

Dr. Heard referred plaintiff to the Neurology Clinic of the UC Davis Health System, where she was seen on July 12, 2006. (Tr. at 340-42.) Plaintiff reported that she could not use her left arm and had pain on the left side of her neck. She stated that her symptoms started with pain in her left hand in 1999 and had gotten progressively worse for the last six years, extending to the forearm and arm. She stated that if she uses her left hand in making a sandwich the hand will be incapacitated for the rest of the day, the pain is worse with reaching up and out and picking, she cannot hold any weight -- even a soda can -- in her left hand, she has discoloration and swelling of her left arm, the swelling of her hand sometimes makes it difficult to sleep, and she shakes sometimes. (Tr. at 340.) The physical examination showed limited range of motion in the left upper extremity; strength in her left upper extremity was 3/5 in all muscle groups while all other extremities were 5/5; pinprick sensation was decreased in the left upper extremity while all other extremities were intact to pinprick; and the provocation test for thoracic outlet syndrome was positive for all five. (Id.) Dr. Muizelaar diagnosed thoracic outlet syndrome and CRPS of the left upper extremity. (Tr. at 341.) Medications were prescribed for CRPS, and an x-ray of the upper thoracic was ordered for the purpose of ruling out cervical

/////

lesion.  (Id.)  Cervical spine x-rays taken on July 12, 2006 demonstrated no evidence of a cervical rib or lung mass.  (Tr. at 342.)

Plaintiff's counsel submitted copies of Dr. Muizelaar's records to the ALJ with a cover letter dated July 21, 2006.  (Tr. at 274.)  On August 18, 2006, counsel submitted copies of Dr. Heard's treatment records from May 24, 2006, described supra, and from August 7, 2006.  (Tr. at 275.)  On the latter date, plaintiff complained of disuse of her left upper extremity.  (Tr. at 343-44.)  She reported inability to reach out with her left arm, make a sandwich, or lift more than about two pounds except occasionally during the course of an eight-hour day.  Plaintiff was taking Vicodin three times daily with incomplete relief from pain.  (Tr. at 344.)

With his closing brief, dated October 16, 2006, plaintiff's counsel submitted a letter dated October 9, 2006, in which Dr. Heard stated that, based on his treatment and observation of plaintiff, "I do not believe that she is malingering."  (Tr. at 280, 347.)  In his brief, counsel also discussed the July 12, 2006 report from U.C. Davis, noting the diagnostic assessment of thoracic outlet syndrome and CRPS, and Dr. Heard's records dated May 24, 2006, and August 7, 2006, noting Dr. Heard's diagnosis in May 2006 of thoracic outlet syndrome with signs of autonomic neuropathy and CRPS.  (Tr. at 279.)  Counsel argued that the medical evidence should be found to establish a combination of physical and mental impairments and associated functional limitations so severe as to prevent plaintiff from having the capacity to perform the basic work activities for most jobs in the national economy.  (Tr. at 280.)  Counsel argued further that the medical evidence should be found to equal Listing 11.14.  (Id.)

The record described above refutes the Commissioner's contention that plaintiff never claimed disability based on CRPS during the administrative proceedings.  In addition, the chronology demonstrates that plaintiff could not have asserted the existence of the CRPS diagnosis for her problem with her left hand and arm any earlier than she did.

The Commissioner also contends that the inclusion of CRPS as one of plaintiff's severe impairments would not have made a material difference in the ALJ's analysis.  Social

Security Ruling (SSR) 03-2p demonstrates otherwise. That Ruling sets out detailed guidelines for the evaluation of Title II and Title XVI cases involving CRPS and reflex sympathetic dystrophy syndrome (RSDS). These terms "describe a constellation of symptoms and signs that may occur following an injury to bone or soft tissue," although the injury "may be so minor that the individual does not even recall sustaining an injury." SSR 03-2p, 2003 WL 22399117 at *1 (2003).

> The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue and bone. It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual. When left untreated, the signs and symptoms of the disorder may worsen over time.

Id. The Ruling also recognizes that the nervous system in such cases may produce inappropriate or exaggerated neural signals that may be misinterpreted as pain. Id. at *2. The best chance for effective recovery from CRPS exists if the syndrome is recognized and treated within three months of the first symptoms. Id. Without appropriate treatment early on, the pain and associated atrophic skin and bone changes may spread to involve an entire limb, other limbs, or remote parts of the body. Long-term and even permanent physical and psychological problems may result. Id.

A diagnosis of CRPS "requires the presence of complaints of persistent, intense pain that results in impaired mobility of the affected region." Id. The complaints may be associated with swelling and with autonomic instability, which may be seen in changes in skin color or texture. Id. Treatment includes various analgesics, including narcotics and neurostimulators, to minimize pain and enable the patient to tolerate greater mobility. Id. at *3.

> A mental evaluation may be requested by treating or other medical sources to determine if any undiagnosed psychiatric disease is present that could potentially contribute to a reduced pain tolerance. It is important to recognize that such evaluations are not based on concern that RSDS/CRPS findings are imaginary or

14

1　　　　etiologically linked to psychiatric disease.  The behavioral and
　　　　cognitive effects of the medications used to treat pain need to be
2　　　　thoroughly considered in the evaluation of this syndrome.

3  Id.

4　　　　CRPS "constitutes a medically determinable impairment when it is documented

5  by appropriate signs, symptoms, and laboratory findings" and may be the basis for a finding of

6  disability.  Id. at *4.  CRPS can be established on the basis of persistent complaints of pain out of

7  proportion to the severity of any documented precipitant and one or more clinically documented

8  signs in the affected regions, including swelling or autonomic instability, which may be shown

9  by changes in skin color.  Such signs may not be present continuously, or may be present at one

10  examination but not at the next.  Transient findings are characteristic of CRPS and do not affect a

11  finding that a medically determinable impairment is present.  Id.

12　　　　Medical opinions from treating sources about the nature and
　　　　severity of an individual's impairment(s) are entitled to deference
13　　　　and may be entitled to controlling weight.  If we find that a treating
　　　　source's medical opinion on the issue of the nature and severity of
14　　　　an individual's impairment(s) is well-supported by medically
　　　　acceptable clinical and laboratory diagnostic techniques and is not
15　　　　inconsistent with the other substantial evidence in the case record,
　　　　the adjudicator will give it controlling weight.

16

17  Id. at *5.

18　　　　SSR 03-2p demonstrates that CRPS has unique aspects that must be taken into

19  consideration in analyzing the claimant's impairments and their severity.  Here, substantial

20  evidence in the record demonstrates that plaintiff had the medically determinable impairment of

21  CRPS, that the impairment constituted more than a slight abnormality, and that the impairment

22  had more than a minimal effect on plaintiff's ability to perform basic work activities.  On this

23  record, the court finds that the ALJ erred when he failed to identify CRPS as a severe impairment

24  at step two of the sequential evaluation process.  In reaching this conclusion, the court is mindful

25  that the step-two inquiry is "a de minimis screening device to dispose of groundless claims."

26  Smolen, 80 F.3d at 1290 (citing Yuckert, 482 U.S. at 153-54).

Plaintiff's first argument in support of her motion for summary judgment includes a contention that the ALJ did not consider whether her impairments are medically equivalent to any neurological impairment listed in the Listing of Impairments. The decision at issue contains a finding that the objective medical signs and laboratory findings fail to satisfy the requirements of "any of the pertinent neurological or musculoskeletal (or equivalent) listing [sic] set forth in the Listing of Impairments." (Tr. at 16.)

At step three of the sequential evaluation process, the ALJ is required to determine whether the claimant has an impairment or combination of impairments that meets or equals any impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. The Listing of Impairments sets out more than one hundred physical and mental illnesses and abnormalities severe enough to prevent an adult individual from engaging in any gainful activity, regardless of the individual's age, education, or work experience. 20 C.F.R. § 404.1525(a); Sullivan v. Zebley, 493 U.S. 521, 530 & n.6 (1990). In addition, an impairment not listed in Appendix 1 may be found medically equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a).

Nonetheless, the claimant bears the burden of establishing a prima facie case of disability under the Listing of Impairments. Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (citing Tackett, 180 F.3d at 1098-99). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." Sullivan, 493 U.S. at 530. "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is "equivalent" to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Sullivan, 493 U.S. at 531. A claimant cannot qualify for benefits on the basis of equivalence merely by showing that the overall functional impact of his impairment or combination of impairments is as severe as the overall functional impact of a listed impairment. Id. Put another way, "[t]he functional

/////

16

consequences of the impairments[,] . . . irrespective of their nature or extent, *cannot* justify a determination of equivalence." Id. at 532 (quoting Social Security Ruling (SSR) 83-19).

In plaintiff's closing brief, counsel asserted in a conclusory manner that " the medical evidence should be found to equal 20 CFR, Appendix 1, Listing of Impairments, Part A, Section 11.14." (Tr. at 280.) Listing 11.14, titled "Peripheral Neuropathies," describes an impairment that consists of peripheral neuropathies "with disorganization of motor function as described in 11.04B, in spite of prescribed treatment." Listing 11.14, 20 C.F.R., Pt. 404, Subpt. P, App. 1. Listing 11.04B, in turn, describes "significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." Section 11.00C indicates that persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances, which occur singly or in various combinations, "frequently provides the sole or partial basis for decision in cases of neurological impairment" and that assessment of the impairment "depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms."

While it is true that the ALJ failed to recognize one of plaintiff's severe impairments and made only a cursory mention of the Listing of Impairments, the court finds that plaintiff has failed to bear her burden of establishing a prima facie case of disability under Listing 11.14. Plaintiff has not pointed to sufficient evidence of significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. Because plaintiff has not established equivalence, the evaluation of plaintiff's combination of impairments must proceed through the remaining steps of the sequential evaluation to determine whether she has the residual functional capacity to engage in substantial gainful activity.

/////

/////

## II. Steps Four and Five:  Residual Functional Capacity

Plaintiff's second, third, and fourth arguments challenge the ALJ's determination of her residual functional capacity (RFC) and the use of that RFC to find her capable of performing other jobs existing in the national economy.

A claimant's RFC is "the most [the claimant] can still do despite [his or her] limitations."  20 C.F.R. § 404.1545(a).  The assessment of RFC must be "based on all the relevant evidence in [the claimant's] case record."  Id.  See also Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001).  Where the claimant has the impairment of CRPS, all of the claimant's symptoms must be considered in deciding how such symptoms may affect functional capacities, and "[c]areful consideration must be given to the effects of pain and its treatment on an individual's capacity to do work-related physical and mental activities in a work setting on a regular and continuing basis."  SSR 03-2p at *7.

> Opinions from an individual's medical sources, especially treating sources, concerning the effect(s) of RSDS/CRPS on the individual's ability to function in a sustained manner in performing work activities, or in performing activities of daily living, are important in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC.

Id.  It is also recognized that third-party information may also help in assessing an individual's ability to function on a day-to-day basis.  Id.

### A. Treating Physician's Opinion

The medical opinions of treating physicians are entitled to special weight.  Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989); Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988).  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Lester, 81 F.3d at 830.  Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected "only for 'clear and convincing' reasons."  Id. (quoting Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)).  If the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject the

opinion without providing "'specific and legitimate reasons' supported by substantial evidence in the record for so doing." Id. (quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).

An ALJ may meet the Commissioner's burden of setting forth specific, legitimate reasons for giving less weight to the controverted opinion of a treating physician by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation of the evidence, and making findings. Thomas, 278 F.3d at 957 (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The ALJ must explain why any significant probative evidence has been rejected and must reach a decision that is supported by substantial evidence. Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003); Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

Here, the ALJ rejected Dr. Heard's November 2003 opinion that plaintiff was unable to work. Although "[a] medical source opinion that an individual is 'disabled' or 'unable to work' . . . is an opinion on an issue reserved to the Commissioner," "[e]very such opinion must still be considered in adjudicating a disability claim." SSR 03-2p at *8 n.3. Here, the Appeals Council specifically directed the ALJ to address Dr. Heard 's November 2003 opinion after requesting that the treating physician provide additional evidence or clarify his opinion. (Tr. at 246-47.) Despite the fact that additional evidence was provided on remand, as noted supra, the ALJ did not consider the extent to which Dr. Heard's November 2003 opinion was based on years of reported signs and symptoms, clinical findings and diagnostic tests. The ALJ failed to consider the November 2003 opinion in light of Dr. Heard's treatment notes from 2002 and 2003, and he completely disregarded significant probative evidence from 2005 and 2006 that had led Dr. Heard to diagnose CRPS in May 2006 and resulted in Dr. Muizelaar confirming that diagnosis in July 2006. Dr. Heard's treatment records reflect plaintiff's persistent complaints of pain out of proportion to the severity of any injury she might have suffered, with clinically documented signs of CRPS in the affected regions, such as swelling, autonomic issues, and skin discoloration.

1  Dr. Heard's clinical findings and diagnoses are supported by the examinations and

2  evaluations of Drs. Ferraro, Birk, Lee, and Muizelaar. Any apparent conflict between Dr.

3  Heard's findings and those of consulting physician Dr. McIntire are explained by the nature of

4  CRPS, i.e., the fact that transient findings are characteristic of the condition. For that very

5  reason, SSR 03-2p cautions against arranging for consultative examinations in CRPS cases

6  except as a last resort when evidence from treating medical sources is unavailable or inadequate

7  to determine disability. In this context, medical opinions from treating sources are entitled to

8  deference and possibly controlling weight. SSR 03-2p at *4-5.

9  The court finds that the ALJ erred by relying on the evaluation of the consultative

10  examiner and by giving "little weight" to Dr. Heard's opinion solely on the stated ground that he

11  "attempts to make the ultimate conclusion of disability, which is reserved to the Administrative

12  Law Judge." (Tr. at 16.) Dr. Heard's treatment records provide substantial evidence that

13  plaintiff was unable to work in November 2003 when the treating physician's opinion was sought

14  by county health services. The court concludes that plaintiff is entitled to summary judgment on

15  her argument that the ALJ erred in his rejection of Dr. Heard's opinion on this ground.

16  **B. Plaintiff's Subjective Testimony and Lay Witness Statements**

17  Plaintiff contends that the ALJ erred by finding plaintiff not fully credible and by

18  not addressing the statements given by her lay witness. Again, the ALJ's errors stem in part from

19  his failure to recognize plaintiff's CRPS as an impairment and then to evaluate the impairment in

20  accordance with SSR 03-2p. It has been recognized that in cases involving CRPS, the

21  individual's symptoms must be carefully considered in determining whether the impairment is

22  severe and in deciding how those symptoms affect functional capacities. SSR 03-2p at *6-7.

23  Third-party information "is often critical in deciding the individual's credibility." SSR 03-2p at

24  *7. Information from neighbors, friends, relatives, and others "helps to assess an individual's

25  ability to function on a day-to-day basis and helps to depict the individual's capacities over a

26  period of time, thus serving to establish a longitudinal picture of the individual's status." Id.

The ALJ stated that he did not credit plaintiff' testimony regarding her restrictions for sitting, standing, and walking "because such limitations are not shown to be a reasonable consequence of her medically determinable impairment." (Tr. at 18.) The ALJ's conclusion is flawed because CRPS is characterized by intense pain and findings indicative of autonomic dysfunction, by signs and symptoms that worsen over time, and, if the condition is not diagnosed and treated early, by pain and associated atrophic skin and bone changes that may spread to involve an entire limb, other limbs, or remote parts of the body. SSR 03-2p at 4-5.

The ALJ also found that, even if the claimed restrictions were a reasonable consequence of plaintiff's medically determinable impairment, "the record viewed as a whole and particularly indications of symptom elaboration by the claimant undermine her credibility regarding her stated limitations and thus cannot be credited." (Tr. at 18.) Although the ALJ acknowledged Dr. Heard's statement that, based on years of treating and observing plaintiff, he did not believe that plaintiff was malingering, the ALJ nonetheless drew an inference of malingering from the report of Dr. McIntire, a consultative examiner who saw plaintiff once and never treated her. (Tr. at 15.) It is true that the consultative examiner noted "multiple nonphysiological aspects and highly elaborated qualities" during his examination of plaintiff. (Tr. at 15, 332-34.) However, in light of the diagnosis of CRPS and the special characteristics of CRPS described in SSR 03-2p, Dr. Heard's opinion that plaintiff was not malingering should have been given controlling weight.

In addition, plaintiff's testimony was supported by the statements of her boyfriend, her boyfriend's brother, and a friend. (Tr. at 122-24, 354.) These statements corroborated plaintiff's testimony in 2004 regarding the severe restrictions on the amount of weight that she could lift and carry with her left hand and arm. Moreover, these statements were based on the witnesses' own observations regarding plaintiff's impairments over a period of time and should have been considered and discussed by the ALJ. See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006); Smolen, 80 F.3d at 1288; Sprague, 812 F.2d at 1232. Clearly,

family members and other persons who see the claimant on a daily basis are competent to testify as to their observations. Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1298 (9th Cir. 1999); Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993). In this regard, if the ALJ chooses to reject or discount the testimony of a lay witness, he or she must give reasons that are germane to that particular witness. Regennitter, 166 F.3d at 1298; Dodrill, 12 F.3d at 919. In this case, the ALJ failed to discuss the lay witnesses' statements at all.

The court finds that the ALJ erred in rejecting plaintiff's subjective testimony regarding her limitations and in failing to address the statements of plaintiff's three lay witnesses. Because the ALJ did not provide clear and convincing reasons for excluding plaintiff's pain and symptoms from the assessment of plaintiff's RFC, substantial evidence does not support his assessment that plaintiff is capable of performing light work that is simple and unskilled if the work does not require her to work in unison with others, does not require overhead work with her dominant left hand, requires only occasional lifting and carrying of 2 pounds with her dominant left hand, but may require frequent lifting and carrying of 10 pounds and occasional lifting and carrying of 20 pounds with her non-dominant right hand. The court concludes that plaintiff is entitled to summary judgment on her argument that the ALJ erred by finding plaintiff not fully credible and by not addressing the statements of plaintiff's lay witnesses.

## C. **Vocational Expert's Testimony**

At step five of the sequential evaluation, the ALJ is required to question a vocational expert in a manner that properly takes into account the limitations on the plaintiff's abilities to engage in various work-related functions. Holohan v. Massanari, 246 F.3d 1195, 1208-09 (9th Cir. 2001). "While the ALJ need not include all claimed impairments in his hypotheticals, he must make specific findings explaining his rationale for disbelieving any of the claimant's subjective complaints not included in the hypothetical." Light v. Social Security Admin., 119 F.3d 789, 793 (9th Cir. 1997).

/////

1    In cases involving the impairment of CRPS,

2        [c]hronic pain and many of the medications prescribed to treat it
         may affect an individual's ability to maintain attention and
3        concentration, as well as adversely affect his or her cognition,
         mood, and behavior, and may even reduce motor reaction times.
4        These factors can interfere with an individual's ability to sustain
         work activity over time, or preclude sustained work activity
5        altogether.  When evaluating duration and severity, as well as when
         evaluating RFC, the effects of chronic pain and the use of pain
6        medications must be carefully considered.

7    SSR 03-2p at *5.  In this case, the ALJ discounted plaintiff's credibility concerning the severity

8    of her symptoms and failed to consider the statements of lay witnesses corroborating the effects

9    of chronic pain and loss of strength upon plaintiff.  In addition, the ALJ failed to consider

10   extensive medical evidence concerning the medications prescribed for plaintiff's pain, the

11   increasing dosages required to provide relief, and the side effects that necessitated frequent

12   changes in these medications.  As a result of these errors, none of the hypothetical questions

13   posed by the ALJ to the vocational expert at the supplemental hearing on October 17, 2006, fully

14   incorporated the effects of plaintiff's pain and related limitations, including those arising from

15   pain medication.  (Tr. at 414-22.)

16        In addition, the ALJ's hypothetical questions did not accurately incorporate the

17   testimony of Sidney Walter, Ed.D. and Ph.D., who testified as a medical expert at the initial

18   administrative hearing.  It was Dr. Walter's testimony that plaintiff's symptoms impaired her

19   mental work functions in two ways:  she would have problems working as part of a team, and she

20   would have to do work "that is somewhat isolated from the public."  (Tr. at 394.)  At the

21   supplemental administrative hearing, the ALJ posed hypothetical questions to the vocational

22   expert that limited plaintiff to simple, unskilled work and excluded jobs where she would be

23   required to work in unison with others but stated, in error, that she "could work in the presence of

24   others, in the presence of public, just not jobs where she would have to work in unison with other

25   employees."  (Tr. at 414-15.)

26   /////

                                              23

In response to the ALJ's second hypothetical question restricting plaintiff's ability to lift, reach, push, pull, and carry with her left arm and to perform overhead work with her left arm (tr. at 418, 427), the vocational expert testified that plaintiff could not perform any of her past relevant work but could perform such jobs as can filling machine operator, information clerk, and office helper (tr. at 418-20). The ALJ's third hypothetical question to the vocational expert added a limitation on frequent repetitive reaching with the right arm, based on Dr. Lee's assessment that thoracic outlet syndrome was affecting plaintiff's right arm and hand. (Tr. at 420.) The vocational expert testified that plaintiff would be able to perform the job of information clerk, but not the jobs of can filling machine operator and office helper, and would also be able to perform the jobs of usher and photo counter clerk. (Tr. at 421-22.) All three jobs referred to by the vocational expert involve working with the public rather than being isolated from the public.

Plaintiff's attorney elicited testimony from plaintiff regarding her medications, their failure to reduced the level of her pain below 6 on a scale of 10, and the pain caused by the exercises recommended by Dr. Muizelaar. (Tr. at 424-26.) Counsel modified the ALJ's second hypothetical question to restrict plaintiff to no reaching with the left arm, and reaching with the right arm for no more than half an hour at a time, for no more than one third of the work day. (Tr. at 427-28.) In response to this modified hypothetical question, the vocational expert testified that plaintiff could still perform the jobs of information clerk, usher, and photo counter clerk. (Tr. at 428.) Counsel then modified his hypothetical question to assume a person who occasionally has such severe pain that she is not able to use either arm for up to a third of the workday. (Tr. at 428-29.) In response to this hypothetical question, the vocational expert testified that if the pain is so severe a person cannot use her arms for up to a third of the workday, there would be no jobs the person could do in the workplace. (Tr. at 429-30.)

The vocational expert's testimony in response to the flawed hypothetical questions posed by the ALJ has no evidentiary value. See Embry, 849 F.2d at 422. The

testimony provided in response to counsel's final hypothetical question demonstrates that, when the effects of chronic pain and the use of pain medications are considered, there are no jobs in the national economy that plaintiff can perform.

**CONCLUSION**

The decision whether to remand a case for additional evidence or to simply award benefits is within the discretion of the court. Ghokassian v. Shalala, 41 F.3d 1300, 1304 (9th Cir. 1994); Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990). The Ninth Circuit has stated that, "[g]enerally, we direct the award of benefits in cases where no useful purpose would be served by further administrative proceedings, or where the record has been thoroughly developed." Ghokassian, 41 F.3d at 1304 (citing Varney v. Sec'y of Health & Human Servs., 859 F.2d 1396, 1399 (9th Cir. 1988)). This rule recognizes the importance of expediting disability claims. Holohan, 246 F.3d at 1210; Ghokassian, 41 F.3d at 1304; Varney, 859 F.2d at 1401.

Here, it is plain that no useful purpose would be served by further administrative proceedings. Plaintiff filed her applications for disability insurance benefits and supplemental security income six years ago. The Appeals Council's remand order provided an opportunity for further development of the record. The vocational expert's answer to the expanded hypothetical question posed by plaintiff's counsel affirmatively establishes that plaintiff was unable to perform a significant number of jobs in the national economy at the relevant time. Had the ALJ based his decision on the vocational expert's testimony in response to the more complete hypothetical question posed by counsel, the ALJ would have found plaintiff disabled as of the alleged onset date. See Lingenfelter v. Astrue, 504 F.3d 1028, 1041 (9th Cir. 2007) (finding the claimant entitled to disability insurance benefits and supplemental security income where he needed to lie down two or three times each day for up to 45 minutes due to pain and where the vocational expert testified that there were no jobs available in the national economy in light of that limitation).

/////

For all of these reasons, this matter will be remanded with the direction to award benefits on the ground that plaintiff was under a disability as defined by the Social Security Act on July 23, 2002. See Moore v. Comm'r of Soc. Sec. Admin, 278 F.3d 920, 925 (9th Cir. 2002) (remanding for payment of benefits where the ALJ improperly rejected the testimony of the plaintiff's examining physicians); Ghokassian, 41 F.3d at 1304 (awarding benefits where the ALJ "improperly discounted the opinion of the treating physician").

In accordance with the above, IT IS HEREBY ORDERED that:

1. Plaintiff's December 6, 2007 motion for summary judgment (Doc. No. 14) is granted;

2. Defendant's February 8, 2008 cross-motion for summary judgment (Doc. No. 17) is denied;

3. The decision of the Commissioner of Social Security is reversed; and

4. This case is remanded with the direction to calculate and award benefits.

DATED: May 15, 2009.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:kw
Ddad1/orders.socsec/boulanger0849.order